It pleases the court. I'm Danny Griffith. I'm here defending Officer Lynn Brown. There are a bunch of aspects of this case that we could talk about in different directions, but the record is actually fairly small. The points that I want to hit with you is when must the bite and hold technique terminate, and then I want to talk about some things in the record that were dealt with in a subjective way by the lower court on summary judgment, particularly what's in the record in terms of policy and training, what's in the record in terms of time, injury, and this character discussion. First, you have to understand a little bit about Horn Lake. Lynn Brown is a canine officer with Horn Lake. He's been there for a very long time. His CV is in the record. Gentlemen, he has been on three deployments training military officers in handling of canines. He helped develop their policy. Their policy and training is extensively developed in the record. Now, the comments particular to policy here highlight the case, and I'm kind of starting at the back and going to the front, but I've got a reason for doing it. It's because, first and foremost, in an individual capacity claim, whether or not there's a policy violation really shouldn't be anything we're talking about, but it demonstrates how the evidence is misapplied here. When asked in his deposition about the particular policy, and that's where the policy discussion comes from in the case, it comes from the excerpts of deposition of Lynn Brown and the actual policy. What he explained was is that I've been there the longest, and the standard operating procedure is that if I'm out, I'm the one on call. Now, what happened in this situation is that there is criticism in terms of policy that's clearly subjective, and it jumps past evidence. It jumps past evidence that if you look at Judge Dennis, when I prepare for an argument, I go looking at the panel, and there was a dissent that Your Honor and Judge Graves did on the Tolan v. Cotton case, and the fact argument about that is exactly part of my point here about policy and time and character evidence, and that is that the court ignored evidence. Lynn Brown explained that he's the one to go, and wouldn't you want to have your most experienced officer to be the one on call? The second point about policy evidence, Your Honor, is an approach that's taken in here that basically says the policy requires an advance and announcement. That's not true. That's not what the policy requires. The policy would require an announcement if you were doing an apprehension. Go seize this person. The policy would require an announcement if you were in a building. This is the Horn Lake Police Department. We're fixing to come in here with a dog. The policy does not require an announcement if you go in and you're going to go run a search with a dog. Now, why am I talking about policy when it's irrelevant? Because it shows that this is a subjective analysis by the court, and it's not objective. In terms of time, there are discussions in here repeatedly in this summary judgment opinion about, he let that dog hang on him for a minute, he let that dog hang on him for a minute. That's not true. The testimony comes in three points. There's deposition testimony from Mr. Cooper. Did Mr. Brown say that it was one or two minutes? He specifically said more than 30 seconds but less than a minute or two. There are three pits of evidence on time, the first being when Mr. Cooper says more than 30 seconds, and then when he comes back when his attorney asks him, he says way more than 30 seconds, at least a minute. And then Mr. Brown, the officer, says more than 30 seconds but shorter than a minute or two. The key there, though, is that the court pounds on this minute, and that's just not there. If we were looking at that same Tolan versus Cotton analysis. I feel like you just said it about three times. Well, it's a range, and it's certainly not anything definite and concrete, and it's something that a jury could take and consider and consider differently. In addition to that, my appreciation, of course, we haven't read the record, but the briefs and everything indicate to me that the officer did not need to have that dog locked in his leg, biting him while he put on the handcuffs because he wasn't resisting. And that's a concern, Your Honor, and that's the parts of the record before then, frankly, were passed on by the district court. So that's the issue. At the moment of the threat, this young man has a canine who is engaged in a bite and hold, and the canine is holding on to the young man's leg, and the officer first handcuffs him, then he steps away with the dog and posts up. He does not search him. And in terms of time, there's a document in there that wasn't objected to. I would call it a Rule 1006 compilation that shows from the time he got out of his vehicle to the time he called in apprehension, it was a minute and 49 seconds. Your own expert said that's not normal procedure, didn't he? Well, in terms of where the dog bite is, it would be discretionary with the officer. Let me explain. These animals, these canines are highly trained. This unit here, they've got four units with the city, and they meet once a month for a complete shift. They talk over past deployments and tactics. And one of the things that they would cover would be making sure that the animals are trained to bite in nonlethal areas. Len Brown, in his testimony, which is in the record, and like I said, it's just a few pages of both depositions, but in his testimony he describes an incident where he first removed the dog before handcuffing. The reason he did in that case was because it was injury sensitive. In that case, an older dog bit a suspect in the neck and head area, in a vital area. Well, none of us consider use of a canine deadly force, but if you bit someone in the neck, it certainly could be. These injuries were pretty severe, weren't they? They were, Your Honor. Reconstructive surgery and some other things? They were, Your Honor, and the picture is what it is. And the thing about the injuries, Your Honor, the testimony, the sole testimony about the cause of the injuries, again, comes from Len Brown. They're asking him, okay, so your dog's trained to bite in nonvital areas, and how do you explain this injury? He said, well, injury comes from two things, where the animal bites and the resistance in opposition to the animal by the suspect. Now, I realize the district court's take on this is that it's difficult to show your hands when you have a canine attached to your leg. I understand every bit of that. But be that as it may, he ended the threat, and as soon, I mean, he didn't delay it any longer than handcuffing. As soon as it was over, he stepped back. Someone else searched him. Someone else was immediately there to provide medical attention. That was the safest period of time. In terms of case law, though, there's not a Fifth Circuit case that disapproves a bite-and-hold technique. There's not a Fifth Circuit case that says you cannot use a bite-and-hold technique. There's not a Fifth Circuit case that says you cannot use what's called a drag technique, which in this case, it's dark. The suspect has ran. He's hiding outside a house in a residential neighborhood. The canine spots him before the officer. The canine reacts. The officer has to shine his light onto the young man to see him. And his first sight is the dog's on his leg, and the young man has got his hands on the dog's head. That takes a bit of time to get him down on the ground. He submits. He's cuffed. The officer removes himself. Now, in terms of case law, the reason why I talk so much about handcuffing in the briefing is that it's a clear point in time. I believe in these cases we should try to focus on officer perception. If we go back to the original Graham v. Connor, nobody ever talks about the facts of Graham. In Graham, it was a diabetic. He was starving for orange juice because anybody with a diabetic in their family knows you've got to get a little bit of orange juice when your blood sugar gets low. He runs into a convenience store. He gets a friend to take him up there. He dashes in. The line's out. He's not doing anything wrong, but he's shaking, and he needs his orange juice. And if you've ever been around anybody, you'd understand. An officer sees this man dash in and out of the store and follows him. The officer's perception is that something's funny here. He's gone in and out of here. What's going on? Before the lines of communication cross between this officer and this gentleman, Mr. Graham, he has been forcibly taken into custody. Now, what do we get from that? We get that, all of these wonderful quotes about hindsight, 2020, et cetera, et cetera, but we get the importance of officer perception and an objective standard. And in this situation, the testimony in the record before you from my client is that he has previously had a situation, and knows of others, where he pulled a canine off too early. Now, a canine is a tool like anything else. It can be used properly or misused. In a situation where you pull the canine off too early, you can run into a situation of a reengagement. And I'll argue in the brief, hopefully not too unartfully, but how many times are you entitled to run before the officer makes sure and gets you in cuffs? What's the worst thing under the facts of this case that are in the summary judgment record? What's the worst thing that likely could have happened if the dog had been pulled off earlier? In terms of time frame, you have to back up. There is some period of time between the young man, he comes out into the light, he's on the ground. Let's say he's on the ground.  Let me get your hands and cuff you. You're only talking about a few minutes. The worst thing that could have happened, the young man could run again. The officer and the young man could end up rolling around on the ground, other officers showing up in a dog loose. The momentary difference in time is completely authorized under the officer's discretion. From his perception, the thing to do and what they are taught is to come in, first get them in cuffs, and back off. From what you've told me, I appreciate you've directly answered my question, but it just doesn't seem to me that there's anything from what you've said that indicates that anything would have happened that would have been so unfortunate or harmful that if he had been released from the hold earlier, he would have maybe run away would have been the worst thing. At what point, Your Honor? This has not suspected a person with a weapon or someone who's committed some kind of a robbery or is any other way dangerous. Doesn't all that play into the length of the hold? Well, it does, and that's why as soon as he was in cuffs, without even searching him, the officer backs away, posts up, and somebody else comes in search because that's an orderly time to do it. And the injury, the sole testimony as to the injuries being acerbated is from Lynn Brown, and it's in the record, and it says it's based on whether the dog bites and the degree of resistance, both of which, not the duration of this, whatever that may be, but that's the sole testimony that a jury could infer from. Now, in terms of case law and qualified immunity, I don't want to be remiss and not discuss this at some length. There just isn't a case, Your Honor, and I'm running quick. There's no case law that compels releasing this young man before handcuffing. The Ellington v. Carroll case has now been cited over and over, and the thing about the Ellington v. Carroll case The district judge said that this was so obvious you don't need a case. Is it like Hope v. Pelzer? I understand that, and that's often argued and rarely applied, and this is not such a case. If you had a situation But what's your argument? I mean, you've spent a lot of time talking about time, really, most of your argument here, so what is it you're saying is so distinctive about this interaction? A point in time. I mean, you keep saying it. I mean, I think we get you, but These officers are trained. Their perception of the situation But you want us to focus on the officer's perception in a temporal frame. Is that the argument you're giving? An officer's perception is what controls objectively, Your Honor. And his perception was? His perception was, I process this, I get the dog off of him as quickly as possible, but I make sure he's secure first. Then there's no risk of him getting up and running. There's no risk of reengagement. This is handled, and it was all handled. There's a little time sheet in there. Exhibit J to the summary judgment that covers that. Like I said, you told us about time, sort of ad infinitum, but to Judge Smith's question, as he said, you know, like what's the worst going to happen? I mean, that doesn't factor into the officer's perception. I mean, given other cases we have, you know, it's a fleeing felon. I mean, it's a burglar. You know, he's got a gun, et cetera, et cetera. So you say that has no The things that could happen, the things that could happen is the young man could have grabbed a weapon going through the yard. The young man could get up and run. The officers, by this decision, could say, we're not going to chase at all. Those are all there. That's my five. Okay. Thank you, sir. All right. How do you pronounce it? Fletchess? Fletchess? Fletchess, yes, sir. Fletchess. May it please the Court. My name is Brandon Fletchess, and I appreciate the opportunity to be here today to present a case for Jacob Cooper. To start, I would like to address some of Mr. Griffith's earlier points. First of all, the timesheet made by Officer Brown's previous attorney, which is on page 264 of the record, is wrong. It is absolutely wrong in its assertion. And if the Court would like for me to prove that it is wrong, I can supplement the video to the Court. It says that the K-9 apprehension was at 22-56-53. Actually, K-9 apprehension was not announced until 22-57-22, 29 seconds later. Twenty-nine seconds later doesn't sound that long standing here, but 29 seconds is a significant amount of time when you have a Belgian Malinois biting your leg and tearing your calf out. So the encounter was not 1 minute and 49 seconds. It was at least 2 minutes and 18 seconds. And we don't know if when Officer Brown actually announced K-9 apprehension, whether the dog was still on him. Remind us, and obviously only from the record, the extent of the injuries. Page 165 of the record, if you look at it, about half of his calf muscle was torn out, significant tissue loss. One of the officers actually testified that the officers went back, three or four of them, and were searching for the missing piece of his leg, and they couldn't find it, which only leaves one conclusion, and that is that the dog ate it. So that is the type of injury you're dealing with. It was an open wound for two years, required several skin graft surgeries, over $100,000 in medical expenses. It was significant, to say the least. So definitely no argument that this could be a de minimis injury. What does the record say, if it does, about the size and weight of Mr. Cooper? If it's not in there, don't speculate. If you look at our expert report, which starts on page 404, and I can't tell you exactly where he discusses it, he talks about Mr. Cooper being, I think, 6 feet tall and an average-sized guy. He's about 165, 170, and I think that is in my expert's report. Okay, that's fine. You don't need to spend any more time on it. But that starts on page 404, just so you know. Also, I never interviewed or took the deposition of Jacob Cooper. Lynn Brown's attorney did. Lynn Brown's attorney tried to get Mr. Cooper to say, at page 133 of the record, that the dog was on him realistically about 30 seconds, and my client was adamant. No, it was a minute at least. And then he goes into a big description of the horrific detail of it while he was laying on his stomach begging to have the dog taken off. Lynn Brown's testimony is clear. I took that deposition. I said, how long was the dog on him? Kind of silent. I said, well, about 30 seconds. I even gave him an out. He chuckled and said, no, it was longer than 30 seconds, but longer than a minute or two. So Mr. Griffith's characterization of the record just in those brief spots underscores the district court's warning that summary judgment is appropriate in this case to not allow a skilled attorney to alter the record, to alter the testimony, to allow some degree of recanting in front of a jury, since now they know that the record is not in their favor. It's quite unusual, at least in my experience, to see in a case like this a summary judgment granted for the plaintiff. Obviously we see a lot of appeals from denial of summary judgment on qualified immunity. I have a question. You've said that there's no jurisdictional problem. That's what your brief said. But, of course, parties can't concede jurisdiction. I question whether there is jurisdiction over the summary judgment that was granted for the plaintiff. But assuming there is and assuming that we can look at that, how would this be the unusual case in which instead of the matter being remanded for trial, that actually the plaintiff would be granted summary judgment? The district court ruled that summary judgment was appropriate for Jacob Cooper, and in so ruling found as a matter of law that Lynn Brown's actions were objectively unreasonable under clearly established law. This court has jurisdiction over issues of law ruled upon by district courts. And I think that both of those... Well, you're right about that. Excuse me, I don't mean to interrupt you mid-sentence, but the qualified immunity appeal is very limited and very specific, and I think some of our case law says that. It's just unusual for us to have. I couldn't find any cases that really deal with this that show that we have the ability to answer any question other than just the denial of qualified immunity. Your Honor, I've got to be honest with you. This is the first time I've ever had a case so clear that I felt that I could file a motion for summary judgment as a plaintiff. I haven't found a case directly on point on the jurisdictional issue. I can tell you that it is a pure question of law, and my understanding of the jurisdiction of this court is that on questions of law, this court has appellate jurisdiction. Other than that, I don't know that I can really answer and point to a case that says that, other than to say that this is the first time as a plaintiff I've been able to file for summary judgment and have it granted. Sort of on that same note, it seems to be a conceded point that Len Brown is not entitled to qualified immunity on this appeal. It doesn't even argue that he's entitled to qualified immunity, because in order to say that you're entitled to qualified immunity, you would have to look at the circumstances under Jacob Cooper's version of the events, and it seems that everybody, Len Brown, of course me, and all the parties involved, and Wendell Knope, the defense's expert, all agree that under Jacob Cooper's version of the events, Len Brown's actions would have been objectively unreasonable in light of clearly established law. So all the arguments I make in my brief and in today's oral argument are viewing the record in the light most favorable to Officer Brown. Well, we could decide that there's no specific case like this on the books so that the officer kind of gets one free chance. That is to say, the first time that we haven't decided it, then the officer is granted qualified immunity, and henceforth officers in this circuit would know whatever it is that we rule. And, Your Honor, I would say that that would be an injustice, and I would say it for this reason. Well, but that's the way qualified immunity works. You understand that. I do understand that, Your Honor, but in Newman v. Guidry, which is an opinion which you authored, 703 F. 3rd 757, addressing the clearly established prong, you stated that the central concept is fair warning. The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases before the court. So did Lynn Brown have fair notice that he could not leave a dog attacking a surrendered, compliant, nonviolent misdemeanor suspect? The Seventh Circuit addressed a very similar question in Becker v. Elfrick. In that case, they recognized that no specific case stating an officer cannot leave a dog on a nonresisting or at the most passively resisting suspect existed in the Seventh Circuit. However, they also noted that the Seventh Circuit had previously held that using impact weapons under those same circumstances was objectively unreasonable. The case went on to hold that a case directly on point is not required for a right to be clearly established. Officers can still be on notice that their conduct violated established law, even in novel factual circumstances. Very similarly, this very circuit has held that using a taser or striking a nonresisting suspect without regard for whether he's handcuffed, without regard for what Lynn Brown refers to as the clear line of handcuffing, nonresisting suspect, even where the suspect had previously fled. That's a case cited in my brief and discussed at length, Anderson v. McCaleb. Not only that, the Fifth Circuit said in that case that the officers should have known that. And just like the Seventh Circuit, the Fifth Circuit held in Newman v. Gedry that lawfulness of force does not depend on the precise instrument used to apply it. Qualified immunity will not protect officers who apply excessive and unreasonable force merely because their means of applying it are novel. Furthermore, in an obvious case, which we would contend this is an obvious case, the Graham excessive force factors themselves can establish the answer even without a body of relevant case law. Both Anderson and Newman were decided prior to Mr. Cooper's arrest. And, of course, the reasoning of Newman is the reasoning of Hope v. Pelzer. And that reasoning is that officers do not get that free pass on obviously unconstitutional conduct simply because his or her particular federal appellate court has not addressed that specific fact pattern. As the district court said, if this exception did not exist, defendants might feel at liberty to engage in a wide variety of obviously unconstitutional conduct which has not yet been declared unlawful by a robust consensus of federal appellate authority. It also seems clear that there'd be some mechanism for plaintiffs to break through the general requirement of prior precedent lest the law end up essentially frozen in place with little potential for development based on the novel fact patterns or evolving law enforcement practices. As a refreshing practical note, the district court also stated that cases involving fact patterns as egregious as this one generally settle before reaching the federal appellate stage. The entire argument by Lynn Brown that handcuffing is the only clear line without regard for a need for force prior to handcuffing flies in the face of the basic and longstanding principles in this circuit with regard to excessive force. In Ramirez v. Knowlton, the court made clear that you must balance the amount of force used against the need for that force. So the basic question is, was the force necessary? Unnecessary force resulting in injury is by definition excessive force. It is very important to note that there has never been any need shown for Officer Brown to have his dog biting Mr. Cooper at all. Now, under Mr. Cooper's version of the events, everyone agrees it would have been excessive because the dog would not have been put on until after Mr. Cooper had already rolled to his stomach and complied and then Lynn Brown would have ordered the dog to go on. Everyone agreed that would be excessive. Under Brown's version of the events, the initial bite was accidental and therefore Brown had obviously assessed no need for the dog to bite Mr. Cooper at all. So without any justification for the initial bite, can we find any justification for allowing the attack to continue? The only resistance. If we were to determine that we have jurisdiction over the grant of summary judgment and if we were to affirm that grant, I'm not suggesting we will or we won't, but if we should do that, the case would still go back to the district court, would it not, for damages and attorney's fees? Damages only. And damages and attorney's fees, yes, Your Honor. So let's go back either way is what I'm saying. Right. Anyway. Right. But again, I would pay heed to the district court's warning that evidence can be altered if a skilled attorney is given the opportunity to do so, and I think that we've already heard through the altering of testimony in front of this court that that is exactly what they mean to do. The only resistance noted by Officer Brown is at most Cooper's passive resistance for not standing up and putting his hands up while he was being attacked by Brown's dog, or as the district court aptly put it, the feats of willpower, which Officer Brown appears to regard as necessary for suspects to perform in order to obtain his mercy. But even if Cooper had performed this feat of willpower, there's no evidence that Officer Brown would have removed the dog from him. He's adamant that he can leave the dog on through handcuffing no matter what, despite compliance. So the only justification we get from Officer Brown is, well, I know of other situations where suspects have done things after the dog was taken off or where there was resistance after the dog was removed. Well, the grant factors don't include an analysis of whether there was a threat to safety or a threat of resistance somewhere in the realm of possibilities. The grant factors call for an analysis of whether there is an immediate threat to safety or if the person is actively resisting or actively attempting to evade arrest by flight, which Jacob Cooper was not. So recognizing that we can't look back in 2020 hindsight and second-guess an officer who found himself in a tense and rapidly evolving situation, to be fair, we also cannot do the opposite, which is to ex post facto justify an officer's actions by adding in what-ifs and possibilities and he-could-haves and elements and inferences of danger that were not actually present at the time. That's particularly the case where, as here, an officer violated so many of his own department's policies, resulting in this situation. Brown violated K-9 policy and Horn Lake in almost every conceivable way. No supervisor approved the deployment. The on-scene officer, Michael Pressgrove, did not request a K-9 unit. Brown deployed without a backup officer, and Brown failed to make an announcement to give Cooper notice that a dog was being used and that there was potential for being bitten, and Brown conceded that announcement was required. He just said he didn't give it. So any argument that it wasn't required under the circumstances is simply not true. Of course, the deployment of the dog itself is not a constitutional violation, and given more time, I could expound on that actually would be appropriate if we were saying that was the constitutional violation and appropriate application of the clearly established prong, because that's a hard question to answer. But here, that's not the constitutional violation, but it certainly plays into the totality of the circumstances. So what were the circumstances that night according to the police officers who were there? Michael Pressgrove testified. During the several-minute encounter, Cooper was respectful and compliant. Officer Pressgrove was with Cooper for about seven minutes prior to Cooper taking off on foot. Pressgrove was never concerned for his safety with Cooper. Cooper never gave Pressgrove any reason to believe that Cooper was armed. Pressgrove felt comfortable turning his back on Cooper several times, where he wouldn't have done that if he thought Cooper was dangerous. As a misdemeanor DUI suspect, Cooper was probably not a danger to anyone even when he ran, and Officer Pressgrove made a point of saying we could have filled out warrants later and arrested him on the DUI if we had his car. Based upon his interaction with Cooper, Pressgrove believed that Cooper was not a risk to officer safety. It is not normal to deploy a canine when the underlying charge is a misdemeanor DUI. Isn't it also fair to infer, though, that because they thought he was intoxicated, that his behavior might become or be erratic? They could infer that it might become, but it never did. So you have to look at whether he posed an immediate threat. I guess what I'm saying is knowing that a suspect or a person is intoxicated would lead to a greater expectation, would it not, that that person would engage in erratic, possibly violent behavior of some sort. I'm just saying a greater chance. Well, all I can speak to at this point is what Officer Pressgrove said, which is he never perceived a threat from Cooper at all, and he was with him for several minutes. Now, Lynn Brown himself testified Cooper would have hurt him had he announced. Mr. Cooper never resisted or failed to comply with an order other than the order to come out while the dog was already biting him. So anything about pulling away, causing the injury, anything like that, he testified there was no resistance. There was no pulling away. He did not hit the dog. He did not push away from the dog. He did not kick the dog. He knew Cooper was wanted. The only thing he knew when he deployed was that Cooper was wanted for a misdemeanor DUI. Officer Pressgrove had given Brown no reason to believe that Cooper was a threat. There was no reason that he could not. What do you do with the Brothers case that we just decided regarding police reaction to an intoxicated driver? Your Honor, is this the one where the guy had come from Rick's Cabaret? That's right. Okay. I did read that case. And I wrote it, so I'm particularly interested in what you do with it. I think one of the points you made is that he was still in the car. So if DUI can be viewed as a threat to public safety, and the whole point of the excessive force there was they were getting him out of the car. They were removing him from the threat. So Jacob Cooper was no longer a threat as far as a DUI suspect goes because he was no longer behind the wheel of a car. They had his car. So in that case, I don't believe it was analyzed that he was intoxicated and therefore was a threat. He was intoxicated and still behind the wheel of a car, and the officers were getting him out of the car. And that's why he could be perceived as a threat if I remember that case correctly. I've only read it once, and it was not yesterday. Okay. So with my time running out, I would just say that please look at Wendell Knope's testimony with particular and the quotes relied upon by the district court. Thank you. All right. Thank you, sir. All right. Back to you, Mr. Griffith. Governor Rubel. If it pleased the court, I wouldn't manipulate the evidence, but you'd sure have a larger stack of copies of depositions in there if it was up to me. I want to try this case if I get a chance. The question on qualified immunity is pretty clear. If you look at, for instance, the Poole case, which predates this, they put a man with a dislocated elbow into handcuffs. If you look at the Ellington case, there are 35 taser deployments and multiple strikes before the man's in handcuffs, two kicks afterwards and the two kicks don't get qualified immunity. If you look at Luna, the Fifth Circuit went off on there being time to deliberate, time to explore other alternatives, and the U.S. Supreme Court said qualified immunity hadn't been articulated here like that before to require an immediate risk and no time to deliberate. Specifically, this fails on the second prong of qualified immunity, period. It does. The bite and hold technique has never been disavowed in the Fifth Circuit. It still enjoys universal application across the country. The drag technique, where you pull somebody out into the light for the officer's safety, there's multiple cases that we've cited that officers are entitled for their own safety to get the situation secure. Our suggestion to the court is following what we've seen the court do, which is to stress a point in time when the person really is secure. Now, in the context of the young officer that counsel elaborated on, yes, he didn't perceive a threat from Mr. Cooper. He turned his back on him and he ran off. You know, you shouldn't get a second chance to run. You should make sure that someone is secure. That being the focus of the case, if you shift to looking at the plaintiff's own motion for summary judgment, they've got a burden. The evidence there is construed in favor of the officer. The time testimony is what it is. It's documented, and it's a dart at a board. The policy testimony. The policy testimony is the policy, the training, and the testimony of the officer. Yet the trial court is referring to this as though there were a right to an announcement. The injury testimony, the officer's testimony. The Byrd case, and I believe Your Honor was on that, was where the young man or the suspect is bitten by the canine because the canine's gotten away from the officer and gotten in the water. Under those set of circumstances, Lynn Brown's version, this again is a case where there should not have been summary judgment granted for the plaintiff. The legal issue that I struggle with the most is one that I believe also Judge Dennis and Judge Graves noticed in that dissent, and that was how do you skip to the second question of qualified immunity? Well, you can. I realize that's a philosophical difference, but that's exactly what the U.S. Supreme Court did here recently in the Mullinex case. And if you skip to the second question of qualified immunity, is there a law, a robust consensus of the circuit that compels this officer to disengage before he gets him in handcuffs? Now, if he keeps that dog on a minute after handcuffs, I've got a problem with it. If he sticks the dog on him and he's surrendered, I've got a problem with it. And if you'll look at the testimony Lynn Brown does too, that's not what happened. What happened here is that he took the dog off of him and then he stood back and he posted up. If he was willing to drag it out, he would be giving you excuses like, I had to pat him down before I removed the dog and all that. That's not what you have. That was a case that you had an oral argument on last fall, Judge Dennis, a Tillman case, Marion v. Tillman, and it was a no-jurisdiction case because the facts were hotly disputed. There's a video that shows a great deal of force in the canine on this young man a long time after what? After he's in handcuffs. The clear line of demarcation, at least for qualified immunity purposes, should be handcuffing. A statement from the court emphasizing that passes down through training. Why not when the suspect is prostrate on the ground and not resisting? Why shouldn't the dog be pulled back at that point? Because that delays things, Your Honor. He could get up, he could run, you could have a struggle with the officer. He has not been searched. He was not searched at the scene. Your own expert testified. That was what he usually did. But, Your Honor, I'd love it if you had the whole expert report. I'd love it if his whole deposition was in there, and it's not. And in terms of what a reasonable officer can perceive and what's been the law in this circuit, emphasizing handcuffs. There's some concern for the amount of damage you're doing to somebody, you know, with a dog. Oh, yes, sir. Absolutely. Absolutely. But the sole testimony about what causes the damage in there is from Len Brown, and he explains. What if the officer didn't have a dog, you know? If he don't have a dog and the moment you . . . If he doesn't have a dog around, it doesn't mean you ought to stick him on somebody and leave him on until you handcuff him. Not if the man is not resisting. Well, the testimony in the record from Len Brown is that there was never a true surrender, and that's what's in the record, under oath. I believe my time has expired, but I'll answer away as long as I can. I'm a little curious in your answer to Judge Dennis. You said the whole deposition isn't in the record. Why is that? It's not. They're only selected pages out of all the depositions and the reports in the record. It's the lightest record I've ever run across. Well, okay. I'm just trying to figure out, because you're the appellant and you designate the record. So, I mean, did you just designate portions or . . . doesn't contain. I'm not making up facts, and I'm not grandstanding. I'm dealing with the case that I was given to try, and the case that I was given to try doesn't even have my client's whole deposition in the record. I wish you could see that, but you can't. All right, but if there's a motion for summary judgment and you're defending against that, do you have the opportunity to present anything into the summary judgment record in the district court? Do you not? Why did you not present those additional portions of the deposition or the whole deposition? I did not. I was not retained. I was hired to try the case. I came along two months before trial. So I'm not trying to manipulate the record or enter into any gamesmanship. I'm dealing with the record that I have. And the record that I have, if you look at it from what the statements that are really in there . . . You're talking about what's not in the record if you don't. I understand, but I'm kind of defending myself, Judge. Is your answer that there was another counsel before you? Yes, sir. Is that what you're saying? Yes, sir. At the point in time that Judge Memphis asked me to ask about the record and somebody else handled it . . . Yes, sir. And you came in the case, what, after the summary judgment grant? Yes, sir, and we all do things different. It is what it is. All right. Thank you all. All right, thank you. Both counsel in the case for your oral argument and your briefing. The case will be submitted.